U.S. District Judge Robert J. Bryan
Date of Hearing: June 18, 2021

# UNITED STATED DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ESTATE OF BRENT LEE HEATH, deceased, and MARIE JOYCE, as personal representative for the ESTATE OF BRENT LEE HEATH,<br><br>Plaintiffs,<br><br>v.<br><br>PIERCE COUNTY, a municipal corporation, and CARL SHANKS, and JENNIFER SHANKS, and the marital community comprised thereof.<br><br>Defendants. | NO.  3:19-CV-06119-RJB<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

I.   PURPOSE OF PLEADING

   Defendants seek dismissal on Summary Judgment for Qualified Immunity. This is plaintiff's response.

II.   SHORT SUMMARY/SYNOPSIS OF ARGUMENT

   Mr. Heath was shot in the head by police after a police chase, commenced for expired tabs, when his car was surrounded, off the road, with his vehicle entrapped behind a guardrail between him and the road, and blocked by a ravine and small trees, on a downhill slope, with flattened tires. Of four Pierce County deputies present and surrounding the car, three saw no need to use deadly force, and could articulate no reason the fourth used deadly force.  The shooting deputy claimed he

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

was concerned for the safety of another officer present, but admitted he did not know where the other officer was. The named officer said he was never in danger, and was readily visible.

There were specific policies of the Sheriff's Office which caused this shooting, by defective training and by not requiring witness officers to write reports, and by ratification of excessive force by a sham use of force review.

Mr. Heath survived with half a brain for more than a year, living with a feeding tube and diapers with his sister and family. He died from complications of the gunshot wound on October 3, 2018.

III. RECORDS RELIED ON HERE; ADMISSIBILITY OF POLICE REPORTS FOR SUMMARY JUDGMENT SUPPORT AND OTHER TYPES OF EVIDENCE RELIED UPON IN THIS RESPONSE.

We include[1] excerpts from depositions taken. Those were statements made under oath and are admissible. As additional support for this response, we are also relying on police reports contemporaneously written by officers from their own recollection of events and actions taken, and other records of regularly recorded activity. All of the photographs used were taken by law enforcement at the scene, unless otherwise designated. Not all officers in this investigation were deposed under oath, as the limitations to ten depositions of FRCP 30(2)(A)(i) prohibited obtaining them, even if desired, given the massive number of agencies (7) and officers involved in the pursuit and followup investigation. Consequently, we cannot submit sworn depositions for all officers. Many officers central to the case never wrote official reports as Pierce County has the policy to excuse report writing in critical or deadly force cases if they have given a recorded statement, which is a subject for *Monell* liability, discussed below. Those recorded statements were not under oath. However, those same officers, central to the pursuit and aftermath, who were placed under oath at deposition, affirmed that their recorded statements were true just as if under oath. Exh 10, Koehnke deposition p. 21-22; Exh 15, Cooke Deposition pp. 57-59; Exh13, Shanks deposition, pp. 86-88,

---

[1] A note on the citations to the record: All the exhibits are attachments to the declaration of plaintiff's counsel. Instead of citing "Otto Declaration, Exhibit X," for each citation, we will refer only to Exh, with a brief description of the record.

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 2**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

1   showing adequate indicia of reliability.

2       The police reports of the Kitsap County Sheriff's Office and of the Washington State Patrol,

3   and of the Port Orchard Police Department all are signed under oath, as that is part of their report

4   forms. See e.g., Exh 25, report of Port Orchard Sgt. Donna Main; Exh 36, report of WSP Trooper

5   Weylander; Exh 20, report of Kitsap County Deputy Mano.

6       Police reports are admissible as reliable to the extent they record what they saw and did in

7   their investigation. Entries in a police report based on an officer's observation and knowledge may

8   be admitted in evidence, but statements attributed to other persons are clearly hearsay, and

9   inadmissible under the common law exception to the hearsay rule. *Colvin v. United States*, 479 F.2d

10   998, 1003 (9th Cir. 1973), relying on *Gencarella v. Fyfe*, 171 F.2d 419, 421-422 (1 Cir. 1948).

11   Police reports are also admissible under FRE 803(6), and expressly mentioned in FRE 803(8)(ii),

12   which states, permitting admission of reports of officers.    Under this rule, even foreign police

13   records are not barred on hearsay grounds. *Melridge, Inc. v. Heublein*, 125 B.R. 825, 829 (D. Or.

14   1991). The reports should be admitted here.

15

16   IV.    FACTS OF PURSUIT & SHOOTING

17       Most of the facts of the early chase are uncontested, and are, frankly, of little relevance to

18   what happened at the end of the chase, once Mr. Heath pulled from the roadway onto grass, dirt and

19   gravel, and was surrounded by police cars. For brevity's sake, we accept the recitation of facts stated

20   by the Defendants in their motion from page 1, line 7 (start of pursuit because of expired tabs)

21   through page 4, line 3, with the following additions.

22       The pursuit itself was in violation of PCSO policy, as it was for expired tabs. Exh 33, Policy

23   314.2.1. If the danger created was excessive, deputies were in violation of policy for not breaking

24   off the pursuit. Exh 33, Policy 314.2.2.

25

26       An officer put out over the airwaves erroneous information that he thought, unconfirmed,

27   the car was associated with Riley Buck Leeper, who had a felony warrant for firearms violations.

28   See, Defense exhibits, page 77, part of their Exhibit D, which stated "do not arrest on this

---

**PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 3**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8889 Facsimile

1  information." The vehicle license actually came back to a different person, Vijet Ouk, but this name

2  was not broadcast. Exh 28, Beth Morris rpt. The officers did not know who they were chasing, and

3  did not identify Mr. Heath until after he was shot. Exh 28, Beth Morris rpt.

4      The chasing deputies were aware that the fleeing vehicle had a passenger, gender unknown.

5  Exh 8, Fry stmt I, pp. 11-12 . That was broadcast as well.

6      The spike strips deployed were effective, hitting both sides of the fleeing vehicle, Exh 24,

7  Wofford rpt., p. 3, Exh 23, Horsley rpt., p.1, flattening three of four tires, Exh 35, Grant report p. 1,

8  photographs of the car. The right front was running on the wheel rims. Exh 35, photos, Exh 7, Fry

9  dep., p 75. In addition to first in chase line Deputy Fry seeing the tire disintegrating, there was also

10  the smell of burning rubber, detected by at least two of the following officers, Exh 21, Stacy rpt. and

11  Exh 20, Mano rpt. PIT (Pursuit or Pursuit Intervention Technique, a use of potentially deadly force)

12  was authorized, but not used. The deadly force authorization to PIT became moot when Heath was

13  slowing, then off the road, stopped. Exh 7, Fry depo., p. 77-78. The vehicle was slowing toward

14  the end, and Fry knew it was coming to an end. Exh 7, Fry dep., p. 43.

16      As shown by a retrieved business video, five police vehicles were in the immediate chase

17  pack, Exh 27, Meyers rpt. II, p.1 with two more not far behind. The immediate order of pursuing

18  vehicles was 1) Fry Exh 8, Fry stmt. I, page 4; 2) KCSO Deputy Stacy Exh 20, KCSO Deputy Mano

19  rpt., p. 2; 3) PCSO Koehnke, Exh 11, Koehnke stmt.I, page 3, line 11, 4th or 5th was KCSO Dep

20  Mano, Exh 20, Mano rpt., p. 2, Exh 15, Depo Deputy Cooke, p. 28. . The order had changed as they

21  emerged from the Grandridge neighborhood, with Shanks going from #2 to farther back. He thought

22  he was third, but that conflicts with others. Exh 13, Shanks depo., p 108, 109. Others followed as

23  well. Port Orchard Officers Wofford and Horsley and Bell, after spiking the tires at Grandridge, also

24  pursued northbound on Jackson, seeing the prior officers down the road ahead, Exh 24, Wofford rpt.,

25  page 3; Exh 22, Bell rpt., page 3.

27      Deputy Fry, being the first in line behind the suspect, saw that the Heath vehicle pulled off

28  the roadway to the west, with one rear tire remaining on the pavement, and the other three tires in

dirt, grass and gravel. The vehicle was oriented 70 degrees from the road, not perpendicular. Fry

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 4**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

thought the suspect was going to run, so to prevent that, he put the front of his own vehicle against the driver door at 30 degrees. Exh 8, Fry stmt I, p. 7, 8. Fry then got out of his vehicle and went to the passenger side of the suspect car, expecting the passengers to come out and try to flee. Exh 8, Fry stmt. I, p. 9. When he got there, he saw Defendant Shanks already out of his car, at 2 to 3 o'clock to the suspect car, and Fry positioned himself at 4 to five o'clock to the suspect car. Exh 8, Fry stmt I, p. 8. In doing so, he is compliant with PCSO policy 300.3.1(a), Exh30, to avoid placing oneself in the path of a vehicle. He saw Shanks ten or less feet from the passenger door. Exh 8, Fry stmt I, p. 10. Fry was off the rear quarter panel side of the suspect car. Exh 8, Fry stmt. I, p. 9. He saw the vehicle try to reverse, seeing the backup lights come on and the front, flattened tire start to spin with little effect, it being a front wheel drive on dirt and grass. Exh 8, Fry stmt. I, p. 11, 12. Fry never felt endangered by the Suspect vehicle's movement. Exh 51, page 8 (numbered 3 at the bottom), Fry statement to the BOPS review board, p. 1, 2. Before he could move back to his car to block rearward progress, as was his intent, Fry saw Shanks fire a shot, and the car started moving forward. Exh 8, Fry stmt. I, p. 12. He saw Shanks fire his pistol once, saw the window glass fall to the ground, as well as his pistol's magazine, disabling the weapon. Exh 7, Fry depo, pp. 58-60. When he saw Shanks trying to fix the pistol, Fry ran back to his car, intent to block the Heath vehicle from rearward progress. On the way back to the car, he heard more gunfire. He was on the other side of his own car when he heard the other shots. Exh 8, Fry stmt. I, p. 14, Exh 7, Fry Depo. P.61. By the time Fry got back to his vehicle, the suspect car was already pinned behind the guardrail, parallel to the road. Exh 8, Fry stmt. I, p. 12. He described the movement as five to ten feet, Exh 8, Fry stmt. I, p.13, and ten to twenty feet, Exh 8, Fry stmt. I, p.15, and 20 feet down the hill. Exh 7, Fry Dep. p. 48. By the time he was back in his car, the suspect vehicle was down the hill, on the wrong side of the guardrail. Exh 7, Fry Dep. p. 53-54. He then drove forward, downhill, and blocked further movement of the suspect vehicle. Exh 7, Fry Dep. p. 53-54. Consistent with Fry's statement, others reported that Fry was unable to actually move his car to pin the Heath vehicle until after ALL the shots had been fired. Exh 11, Koehnke stmt. I, p. 11, lines 14-32, Exh 20, Mano rpt., p. 2. After he blocked the car, Fry again came to the passenger side, to avoid a crossfire

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

situation. Exh 8, Fry stmt. I, p. 16.  When there was no further action inside the car, they moved forward and saw the blood on Mr. Heath, and started rendering aid.  Exh 8, Fry stmt. I, p. 16.  Fry drew two diagrams, one of the location of the initial stop, and the second of where they came to rest. Exh 2.

On arrival, Deputy Koehnke pulled behind and to the left of Deputy Fry's vehicle, where Fry had pinned the driver's door of the suspect vehicle.  Koehnke diagram, Exh 3.  Koehnke took position in Deputy Fry's open driver door, where he could see Heath, unable to open his door because of Fry's vehicle, trying to break out his window with his elbow.  Exh 11, Koehnke stmt. I, p. 15, line 6; Exh 10, Koehnke depo, p.38; Exh 3, Koehnke Diagram; Exh 2, Fry diagram; Exh 4, Grant report diagram.  From the broadcast information, Koehnke was concerned he might have to fire on the driver if he produced a weapon, and had his own pistol drawn at low ready, but he could see the driver had nothing in his hands. Exh10, Koehnke depo., pp 36-38.  Koehnke was on the opposite side of Heath's car from Shanks, Exh 3 (diagram) when Heath revved his engine in a rearward movement. Exh 10, Koehnke Depo, p. 38-39.  Shanks fired his first shot into Heath's car, toward Koehnke. Exh 10, Koehnke Depo., p 40-41.  He heard it rather than saw it.  Shanks was off to his right a little bit.  Exh 10 Koehnke Depo., p 41.  Deputy Koehnke was never in peril from the car's movement. Exh 10, Koehnke Depo, p. 62.  He says it went back 10-20 feet, possibly less.  He says he saw the car only make two movements, one backward and one forward, not rocking back and forth.  Exh 10, Koehnke Depo, p. 39-40.   "[I]t moved far enough forward that when it finally stopped it was parallel to the road behind the guardrail," where it ended up.  No one was in front of the car when it went forward.  Exhibit 10, Koehnke depo. P. 52.

Defendant Shanks was the first to join Fry in the pursuit in Pierce County.  He was second in line all the way to the Grandridge development in Kitsap County, and also went around and around inside the neighborhood.  Shanks tried ramming the vehicle which led to a reprimand.  Exh 13, Shanks Depo., pp. 106-108.  As the vehicle exited that place, and it was spiked, other officers fell in line ahead of him.  He thought he was third, behind a Kitsap Deputy. Exh13, Shanks Depo., p. 109.  After the chase ended, Shanks's vehicle was placed to block escape. Exh 13, Shanks Depo.,

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8889 Facsimile

p.120. At the end of the chase, the police vehicles were all "positioned themselves for a felony stop, surrounding the vehicle...." Exh 20, Mano rpt., page 2. Deputy Thompson was further down the hill, waiting for the fleeing car. Exh 19, Thompson stmt, p. 1.

Shanks got out of his vehicle and approached the suspect car on the passenger side, standing three or so feet from the passenger door. He could see no other officers on foot. Exh 13, Shanks Depo., p. 120.

Shanks Carl 3-26-21, (Pages 121:15 to 122:8):

```
15   Q    Why did you fire a shot at the driver?
16   A    Because I thought he was going to back his vehicle up
17        into Mark.
18   Q    Why did you think that?
19   A    Because Mark's vehicle was parked behind him and there
20        was some --
21   Q    Why did you think he was going to back up?
22   A    Well, there was some motion that the driver was going
23        through that led me to believe he was trying to put
24        the vehicle in reverse.
25   Q    Why did you think he was going in reverse, what
1         motion?
2    A    Well, there were a couple things.  The -- I never -- I
3         never saw a manual transmission stick shift, but his
4         hand was palm down in the area where a stick shift
5         would be and it was moving back and forth rapidly like
6         one who was trying to manipulate a manual stick shift.
7    Q    So, you were able to see in the car?
8    A    Yes.
```

Shanks acknowledged that he knew Heath had no firearm as he could see his hands. Exh 13, Shanks Depo., p. 132.

When Shanks fired the first shot, claiming he was "concerned" for Mark Fry, Exh 13, Shanks Depo., page 195, he did not know where Fry was, as he didn't see him. Exh 14, Shanks stmt., p. 20. Fry was actually just to the left of Shanks, readily visible, Exh8, Fry stmt. I, p. 8. In weighing the "concern," Shanks should know the County policy that officers are expected to move out of the path of approaching vehicles. Exh 30. Policy 300.3.1(a).

On firing, Shanks's gun malfunctioned, dropping his magazine and failing to automatically reload. Shanks tried several times to fire it, hearing click click click. He tried two or three times to clear a jam, and fired again, but it did not discharge. Exh 13, Shanks Depo., pp. 134-137. He could

**PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 7**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

1    see that Heath was still operating the vehicle. When he realized his clip was on the ground, he got

2    another one and inserted it, chambered a round and fired four more times. Exh 13, Shanks Depo.,

3    pp. 137-141.  By the time he had his pistol back in action, Shanks had moved to the right, following

4    the car forward, so that the guardrail was between him and the suspect car. It was a mystery to him

5    how he got there, Exh 14, Shanks stmt., p. 23, as in his diagram,  Exh 5, Exh 13, Shanks depo., p.

6    146.  As to the diagram, he drew Thompson in front of the vehicle, but that was after the car stopped,

7    and they both went around to help.  He did not consider less than lethal weapons. Exh 13, Shanks

8    depo., page 177, 178, even though he was so armed, Exh 13, Shanks Depo., page 55.    He

9    acknowledged that the car was moving forward, as he fired, and no officer was in the way. Exh 13,

10   Shanks depo., pp 179-180.

11   

12        The different officers had different estimates of rearward movement.  Shanks said a foot.

13   Exh 13, Shanks depo., p. 124.  Fry said it did not move any noticeable amount.  Exh 7, Fry Depo.

14   p. 49.  Koehnke said it moved back 10-20 feet, possibly less.  Exh 10, Koehnke depo, page 39.

15   Koehnke remembers no rocking, just that it moved backward once and then forward once, far enough

16   to be parallel to the road behind the guardrail. Exh 10, Koehnke depo, page 39, line 7- 21. It pulled

17   forward under control of the driver.  Koehnke statement, p.10, line 37 to page 11, line 7. Fry also

18   recalled the car tried to go backward, then forward only once Exh 7, Frye depo., p. 63.

19        PCSO Deputy Cooke arrived after the others. It was still loud with sirens, and he approached

20   around Shanks's car, to flank the suspect vehicle. He heard a series of shots, and came around to

21   see the following at Exh 15, page 38:

22   "I saw the suspect vehicle was off the roadway on the left shoulder.  Deputy Shanks

23   was standing basically adjacent to the front passenger side area of the vehicle, maybe
     6, 7 feet away from the vehicle, kind of in front and to the right of the suspect

24   vehicle.  It seemed pretty apparent to me based on what I saw that it was Deputy

25   Shanks that had fired shots.  I saw that the passenger side window of the suspect
     vehicle appeared to be broken out.  I saw what appeared to be injuries to the driver

26   of the vehicle ...."

27   He, too, placed Shanks on the road side of the guardrail in his diagram. Exhibit 6, and the Heath

28   vehicle on the landlocked side.

         At the time Shanks fired the second volley, he claimed tunnel vision and unawareness of any

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 8**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

movement of the car.  Exh 13, Shanks Depo., p. 147.  This followup question was asked and answered:

Q    In your mind's eye what was that tunnel vision focused on?
A    I cannot recall.  It was -- Well, it was focused on him, but I can't tell you how narrow that tunnel was, but it was narrow.

In Exh 14, Shanks stmt. p. 23, he states:

But it...when it was over I was here and I had no idea how the car got from here to here, but as soon as it was over I heard my siren and there were people walking up right here, or running up right here.

In Exh 14, p. 28, Shanks stmt., p. 28, when asked if he followed the suspect car as it moved, he states (with questions omitted):

That... that... this... this whole thing is inexplicable to me..... I don't remember moving.... I remember that when I was done I... I was standing here.... but I have no idea how the car moved or how I moved, frankly... All of a sudden the guardrail was there and... and... and it wasn't there when I came up.

His puzzlement at how he ended up beside the guardrail, and his tunnel vision references indicate he lost control of his faculties, a berserker in bloodlust.  This is not the expected standard of a reasonable law enforcement professional.

To understand the scene photos, it must be understood that the scene was dynamic.  Vehicles which moved from the initial positions of the stop until the shooting were Heath's and Deputy Fry's. Exh 2.  Other vehicles were moved after the shooting before photographs could be taken.  This includes Deputy Cooke's and Stacy's.  Exh 15, Cooke Depo., p. 24.  There was once also a Kitsap Deputy vehicle behind Shanks's SUV, behind which Cooke stopped.  Exh 15, Cooke Depo., page 67-68.  The other vehicles, particularly Heath's, Frye's, Koehnke's and Shanks's were still in place while officers went to the nearby fire station for processing, Exh 7, Fry depo., p.23, and were photographed and also imaged by a Trimble system.  Exh 36, images.  It is important to know that Cooke's and potentially Stacey's vehicles were blocking Heath's rearward movement.  Exh 6, Cooke diagram.

The photographs show the exact location of the first shot; glass fell to mark the spot, Exh 7, Fry depo., pp 57-60., as well as Shanks's magazine.  Please see the photos in Exh 39, which tell the

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8889 Facsimile

story of where the shooting started, how the car moved, and how Shanks followed the car, shooting the fatal shot when the car was trapped. The location is consistent with the diagrams of Koehnke, Fry, and Shanks. In addition to the oral testimony of witnesses, the physical evidence tells the story of events[2]. From the initial position of Heath's car, Fry would not have been able to block his back bumper, as he was against the driver door. Fry did block the back bumper, pinning the vehicle, showing that Heath had moved forward. Exh 36. Shanks said that when he fires that pistol the ejected brass shell casings could go potentially five feet. Exh 13, Shanks Depo., p. 166. Please see the photographs attached to Exh 39, and where the tags are found.

Shanks used his personal weapon, a Glock 35, .40 cal semi-automatic pistol, which he says was approved for use. However, there is no armorer's inspection report, as there was for three other weapons he used. Exh 29. Department regulations require inspection of personal weapons. Exh 31, 32, Policy 312.3.1. Use at a range is not proof of inspection. Witness Hecht, Defense Exhibit K was full of uncertainties which a proper armor's report would dispel. The weapon had been modified in several regards. Exh 14, Shanks statement, p. 3, 4. The one most concerning is that it was said by Shanks to have a "smoother trigger pull." Exh 14, Shanks statement, p. 3 He also had a modified magazine ejector button, though he did not reveal that in his statement to Grant. Exh 14.

Shanks was not interviewed the night of the shooting, as were the rest. Because of another shooting that very night, the Guild representative was already occupied so his interview did not occur until September 27, 2017.   Accordingly, he had six days to contemplate his answers.

The other deputies did not know why Shanks shot Mr. Heath. Fry said he was on a different OODA loop (Observe, Orient, Decide and Act). Exh 8, Fry Stmt I, p. 13-14. " I was making deciding one decision, he was making the other." Cooke said he did not know why he did it. Exh 17, Cooke Stmt.II, p. 15. Koehnke said he did not know why Shanks fired on Heath, not knowing what he may have seen. Exh 11, Koehnke stmt. I, page 18, line 31.

In his investigation leading the KCIRT, Detective Grant contacted a neighbor, Mrs. Wiley,

---

[2]    We will try to get the court color copies, to show the blue glass in the gravel, and the yellow evidence tags, showing shell casings.

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

who witnessed the event occurring across the street from her home.  It was very loud, but she was able to hear only one thing: someone asked something like "What were you doing?"  Exh 26, report of Deputy Meyer, p. 2.

V.    FACTS RELEVANT TO MONELL LIABILITY: DEPARTMENT POLICIES AND FAILURES.

Policies of the department contributed to and caused this shooting.

I.    The training slide & Robert Glen Carpenter

The department used a training slide, starting in 2016, which contained an egregious error of law.  Exh 1.  This slide authorized deadly force in any pursuit, regardless of risk to the public or officers present: "pursuit in itself enough to justify deadly force."  The Kitsap County Incident Response Team leader, Detective Grant, heard of the department removing the slide just before the shooting.  Exh 41, Grant rpt. of 10/3/17.

In fact, Sheriff's office upper management, prompted by inquiry from prosecutors about a recent rash of three shootings of suspects in cars over the prior year, Exh 43, email of Chip Marquiss.  The Admin held a large meeting of the brass to review the training given.  On September 19, 2017, two days before the fatal shooting of Brent Heath, they ordered the offending "Plumbhoff (sic)" slide and two others removed from the training curriculum.  Exh 43.

The person to whom this was directed on September, 19, 2021, Robert Glen Carpenter, creator of the Use of Force Curriculum, then refused to do so, defending the material he had been teaching.  He said "... I won't be making changes with the legal aspects of the training," and "I need to know the trace of the complaint and what was taught in class and who I need to educate in the admin about what we are training...."  Exh 43.  He was then informed by email from Chip Marquiss Exh 43 of the conclave of Brass, and their decision, and the basis:

> "In a nutshell the entire Administration was present, they made a decision and ordered us to carry it out.  My takeaways were that they believe we had grounds for what we were teaching however the majority of deputies were misinterpreting what was taught and made concerning statements about what they had learned.  No one accused DT of teaching people to shoot at cars....however they asked several students after they attended and a large number replied that is what they got out of it."  [emphasis added].

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

Significantly, when Shanks was questioned on 9/26/17, as he himself was articulating the standards for application of deadly force in an elude scenario, he repeated these errors, just as the others who had been polled by the Administration.

Q:    ....do you have like a general...could you characterize a general understanding of, I guess, your Department policy regarding the use of deadly force, when it's authorized, um, obviously not quoting it, you know, chapter and verse, but kid of your understanding of it?
A:    If...if some...if...If the suspect is...putting some...my life or anybody else's life in danger of...grammar's...grammar's messed up...in danger of death or serious bodily injury, then deadly force is authorized.
Q:    Alright.
A:    Um, and my understanding of Supreme Court's rulings with regard to pursuits is that, I think they've had two rulings, is that using deadly force to stop a pursuit is not a violation of the Fourth Amendment.
Q:    Alright.
A:    We've had training on that within the last year.

*************
JV:    And when do you think that training was?
CS:    Within the last two years.
JV:    And who presented it?
CS:    I believe it was Glen Carpenter.

Exh 14, p. 35-36.

Despite this widespread interpretation of the use of force policy, neither Carpenter nor the upper brass communicated the correction to the troops in the field until September 28, 2017, after Mr. Heath was shot, when a corrective message was sent to "clarify" the training. Exh 44, email of Glen Carpenter.

The directive to pull the slides, and the corrective email occurred before Carpenter was interviewed by Grant on October 3, 2017. Even though he acknowledged in the interview that his training was called into question Exh 50, Carpenter statement p. 1, he never mentioned the reasons stated in the email he just received, nor the corrective email he was forced to send. Exh 50. When asked, twice, whether he created the slide, he filibustered about his own training and never answered. Exh 50, Carpenter stmt., page 6, lines 7 to end, page 7, line 7 to end.    Carpenter was brought back to the issue of shooting to stop a fleeing vehicle, and again he never mentioned the administration directive and "clarification" he had just had to send out only five days before. Exh 50, p. 13, line 19. Carpenter did affirm that deadly force, once deployed, should cease when the perceived threat

PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 12

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5568 Telephone
(360) 895-8689 Facsimile

1   is done.  Exh 50, page 15, line 18 .

2       Carpenter was not a person in whom trust should have been given. He had himself been sued

3   in 2014 for excessive use of force in the Western District of Washington Federal Court. Exh 54, a

4   published ruling from that case.  Carpenter had also been discharged from the teaching staff at the

5   Criminal Justice Training Commission for misconduct.  Exh 49, Carpenter depo., p.9.  Finally, he

6   was subsequently charged in 2018 with a Class A felony for use of force, Exh 46, criminal

7   Complaint, after he was drinking and displayed a weapon, and was disarmed, then used a knife

8   cutting the hands of the person who disarmed him, on video.  Exh 47, the Probable Cause

9   Declaration. After the arrest and charging of Mr. Carpenter, he was fired in December 2018. Exh

10  49, Carpenter depo, p. 14.

11

12  ii.      The Use of Force Review/Board of Professional Standards (BOPS) Review

13      The department's review of the shooting led to a conclusion that excessive force was not

14  used. The final order on this matter, Exh 51, p. 1, stated:

15      "The Board determined that the use of force was necessary and justified, Deputy
        Shanks feared for the life of Deputy Koneke (sic) and the other Deputies on the
16      scene.

17      In addition to the use of force using a firearm, the board discussed use of force with
        a department issued vehicle. The board found Deputy Shanks out of policy when he
18      tried to ram the suspect's vehicle while still in pursuit in the [single egress]
        neighborhood.
19

20  This finding of Shanks being "out of policy" for the ineffective attempted vehicular ramming proves

21  the finding that Shanks was "within policy" for the shooting, implicating *Monell* liability.

22      Pierce County's investigation, Exh 51, was remarkably incurious and was fraught with

23  failures to be at all inquisitive of Shanks's use of a modified firearm.  Shank's personal firearm

24  failed during the shooting, but there was not one question about why. There was no question about

25  the modifications including the enlarged aftermarket eject button, or the "smoother trigger pull," and

26  it has never been tested. He had other modifications which he said were not approved by the

27  armorer, including an enlarged magazine eject button, a more robust recoil spring, a non-standard,

28  heavier guide rod, grip tape and an altered sight, and a gun light, which was in use during the

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 13**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

1   shooting. This is contrary to express policy of the department, which requires Armorer approval.

2   Exh 32, PCSO policy on Firearms, 312.3.1. None of the official investigations focus on the

3   peculiarities of this weapon. The firearm was never examined by law enforcement following the

4   shooting, beyond photographs being taken of it.

5   There was not one question about why he fired toward another officer, in a crossfire situation.

6   He actually endangered Deputy Koehnke, but this was never raised.

7   The review team did not address the fact that Fry was never in danger, and even Shanks could

8   not say where he was when he fired on Mr. Heath in the initial shot, Exh 14, Shanks stmt., p. 20.

9   He knew he was not in front of Heath on the second volley, as he knew no one was in front. Exh 13,

10   Shanks Depo., p 146.

11   The fact of the trance state of Deputy Shanks was not addressed in the BOPS review. Exh

12   51. At a minimum, one would expect a psychiatric exam to determine further fitness for duty. This,

13   too was not addressed by the BOPS Board.

14

15   The review team also failed to even discuss or inquire of the alternatives to deadly force, such

16   as the taser and OC spray, with which Shanks was also armed, which were readily available to him

17   after the window glass was shattered and Heath remained functional at the shifter. Exh 51.

18   To cap the errors, the final written exoneration, Exh 51, p. 1, signed by Sheriff Pastor listed

19   Deputy Koehnke as the person he was trying to protect, not Fry, when the only danger Koehnke

20   faced was the firearm wielded by Deputy Shanks, and the hot lead he let loose. See, e.g., Exh 35 and

21   the photos of the pierced driver door.

22   The net result of these failings is a sham investigation.

23   iii.   Lack of required reports

24

25   It was admitted that in officer involved shootings and other critical incidents, no one who

26   gives a recorded statement to an investigator need ever write a report. Exh 10, Koehnke Depo., pp.

27   17-19; Exh 15, Cooke Depo, p. 73:

28   Q.   Why did you not write a report?
A.   With an officer-involved shooting type incident, those individuals present that were involved
     in the incident typically do not give a written report. It is a taped statement or an interview

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 14**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

or a statement submitted through an attorney.

Q.     Now, you weren't even the one who fired the shot, but you were excused from writing a report?

A.     Correct, as I have -- as has happened in other incidents as well.

Even Deputy Thompson, the only one to actually write a report, gave only a cursory summary of events. Exh 18. Please see Exh 56, Roberts depo., p. 8-9, and attachment, Policy 310.6.2, who confirmed the policy.

There is no rational law enforcement purpose for excusing the writing of reports except to impair criminal and civil investigations and impair accountability for the shooting officer and the department. Any detail which the interviewer failed to ask is never documented, and it impedes any opportunity for inconsistency or cross checking of facts. The policy of excusing reports in police shooting cases, or "critical cases" appears to be well established, as each of the Pierce County deputies who were present have stated in deposition, under oath, that it is known that no report is required when a statement is given.

iv.     Plaintiff's Police Practices and Use of Force Expert

Plaintiff has retained a well respected use of force expert, Gregory Gilbertson, who has submitted his report by Declaration in Exh 53. It is his opinion that the actions of Deputy Shanks failed the test of objective reasonableness, taking unnecessary actions and using excessive force against Mr. Heath, falling short of acceptable police standards. He also was aghast at the Pierce County practice, limited to critical cases and police shootings, of excusing report writing, in deviation from well accepted police procedures, and has supplied the model policy of the International Association Police Chiefs on this issue, attached as Exh 54. As well, Gilbertson found the lack of investigation into the firearm after a shooting, and particularly when the weapon failed in use, to be problematic for the defense. Finally, the selection of Carpenter as the use of force instructor, and failure to supervise him and oversee his instruction, and to timely correct errors when found, led directly to this death.

VI.     FEDERAL CLAIMS AUTHORITIES & ARGUMENT

I.     Summary Judgment Generally

PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 15

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

1    Under *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), a

2    party seeking summary judgment bears the initial responsibility of informing the district court of the

3    basis for its motion, and identifying those portions of the pleading, depositions, answers to

4    interrogatories, and admissions on file, together with the affidavits, if any, which it believes will

5    demonstrate the absence of any genuine issue of material fact.  Once that burden is met, the non-

6    moving party must make a showing sufficient to establish the existence of an element essential to

7    that party's case, and on which that party will bear the burden of proof at trial.  The nonmoving party

8    can rely on those materials contained in the discovery, disclosure materials on file and affidavits to

9    establish that there are genuine issues of fact for resolution at trial, to defeat the motion.  Evidence

10   is viewed in the light most favorable to the non-moving party on summary judgment.

11   ii.    Officer Liability

12       Defendants claim Qualified Immunity for the §1983 claims. Under *Saucier v. Katz*, 533 U.S.

13   194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), there is a two step analysis: First, in the light most

14   favorable to the party asserting the injury, do the facts show that the defendant violated a

15   constitutional right?  Second, was the right clearly established at the time of the defendant's alleged

16   misconduct?  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ruled

17   that the order of these two considerations is not fixed.  The order of consideration is for the court.

18       1. Violation of a Constitutional Right

19       Use of force is contrary to the Fourth Amendment if it is excessive under objective standards

20   of reasonableness.  *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

21   Unreasonable actions include the use of excessive force in effecting a seizure of a person under the

22   Fourth Amendment.    The use of deadly force to prevent the escape of all felony suspects, whatever

23   the circumstances, is constitutionally unreasonable.  It is not better that all felony suspects die than

24   that they escape. Where the suspect poses no immediate threat to the officer and no threat to others,

25   the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

26   *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).  An officer's evil

27   intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force;

**PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 16**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8889 Facsimile

nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *Graham v. Connor*, 490 U.S. 386, 397 (U.S. 1989).

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989). Here, there were three other Pierce County deputies at the scene who could not understand why Deputy Shanks fired the two volleys. While the first shot was without justification as Shanks did not know where Fry was when he claimed to be protecting him, the second volley was without any possible justification, as the car was going forward with no officer in danger, and no chance of escape to endanger the public.

2. Right Clearly established

The heart of the issue is the application of the three cases mentioned in the erroneous slide, as those were the law as it existed in 2017. *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014), the title case for the erroneous slide, overturned a lower court ruling denying qualified immunity to officers who had fired fifteen shots into a fleeing vehicle. Critical to the determination was the fact that officers had already undergone a long, dangerous chase, and the vehicle spun out after being "contacted" by a police cruiser, collided with another, the driver was still revving his engine while in contact with a police cruiser, and drove toward officers making them jump out of the way before being freed to continue to flee, further endangering the public down the road. Under the circumstances, use of deadly force was authorized.

Second was *Scott v. Harris*, 550 U.S. 372, 372, 127 S. Ct. 1769, 1771, 167 L. Ed. 2d 686 (2007), which allowed use of force, by bumping the vehicle at high speed to cause the fleeing vehicle to lose control, a use of deadly force. The court found qualified immunity for the officer. The officer was authorized by a superior to use the Precision Intervention Technique (PIT Maneuver), but did something else. In Heath's case, a PIT was approved, but never used by Deputy Fry, as he deemed it unnecessary, the chase slowing down and being all but over. Critical to *Scott, supra,* were the facts presented, that there had already been a high speed chase through heavy traffic, endangering the public, the fleeing vehicle had already crashed into a police cruiser, was almost boxed in, but

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

escaped and fled further down the road at high speed, with like intent. The exigencies placed "police officers and innocent bystanders alike at great risk of serious injury."

Last was *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015), in which an officer fired at the engine block of a fleeing vehicle on a freeway from an overpass. He missed, but four of the six shots found the driver's chest, killing the driver. The court found qualified immunity and dismissed the suit. Critical to the decision were the facts, with the driver twice expressing an intent to shoot at officers with his gun if stopped, a long and high speed chase, and an officer deploying spike strips who was endangered ahead.

Here, Heath's crippled vehicle, surrounded by numerous police vehicles, heading downhill into entrapment behind a guardrail surrounded by trees and a ravine, with no one ahead of him, posed a threat to no one. Perhaps the pursuit was not yet over, as he was still feebly moving his vehicle, but there was no chance of escape, and no chance of injury to anyone. The use of deadly force here is unconscionable.

The initial shot did not appear to cause damage to Heath. There was no justification for that shot. He was having little, if any success moving the vehicle backward uphill in the grass and gravel. The initial shot was taken when he started trying to move backward, revving his engine, Fry was in the best position to see that he was getting nowhere. Fry also saw the shot taken, and the magazine and glass fall to the ground, and Shanks try to clear the weapon. He was not in danger, and he was clearly visible to Shanks. Fry said the vehicle then started forward and so he headed to his car. As he got to the car, he heard the additional shots. The vehicle was already downhill, behind the guardrail, parallel to the road. Koehnke and others saw but two movements of the car: backward, then the shot, and then forward into further entrapment. The diagrams and photos and statements show that the fatal shots were taken over the guardrail, when deadly force was excessive for any legitimate purpose. The defense argues that an officer once using deadly force can continue until the threat is ended. Here the threat was ended, yet the shots were still taken. There is a credibility issue that Shanks, with six days to contemplate his answers, claimed some kind of cognitive disassociation, and tunnel vision. He was moving with the car, intent on homicide.

PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 18

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

Had an officer shot and killed Mr. Heath before he was encircled by patrol vehicles on the side of the road, three tires flattened, trapped behind a guardrail, a different question would be posed here. The first shot was unreasonable, and actually endangered Deputy Koehnke on the far side of the vehicle. Given this, and the facts that the uninspected weapon had a modification to have a "smoother trigger pull," and the magazine fell from the gun, the circumstances allow an argument that it was initially an accidental discharge, despite denials. There is a credibility issue that Shanks, with six days to contemplate his answers, claimed some kind of cognitive disassociation, and tunnel vision. He was moving with the car, intent on homicide. If he was not responsible for his actions, then who is? Mr. Heath was not affected by the first shot. The door glass being gone, less than lethal weapons could be used, which Shanks did not consider.

iii.    County Liability

As stated by the defense, liability of the City is predicated on a municipal policy or custom which has a nexus to the constitutional violation, under *Monell v. New York City*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

1. Policy of shooting at vehicles in pursuits

Given Shanks near perfect articulation "using deadly force to stop a pursuit is not a violation of the Fourth Amendment" of the teachings of Carpenter's "Plumbhoff(sic) " slide: "pursuit is itself enough to justify deadly force," there is a direct link from the County's express policy to the harm inflicted on Mr. Heath.

The flaw with the legal formulation in the training, as repeated by Deputy Shanks in his interview, was that a pursuit, per se, equals deadly force authority. That is not the law. The three cases cited in the video training slide each require the presence of a serious ongoing threat posed by the pursuit to the public or to the officers. *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Plumhoff v. Rickard*, 572 U.S. 765, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014); *Mullenix v. Luna*, 577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015). The decision in each case relied heavily on the extreme danger still underway to determine the use of deadly force was not a violation of the constitutional rights of the driver. The erroneous training slide states the official

Anthony C. Otto
Attorney at Law
Post Office Box 1388
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

policy of Pierce County, which led to the death of Mr. Heath and his constitutional deprivation.

The communication between Chip Marquiss and Carpenter, Exh 43 shows that a large percentage of those who took Carpenter's training had the same misunderstanding of the law. While that is not a defense to Shanks himself, as he is still bound to know the law for qualified immunity purposes. This should have been immediately communicated to those making contact with the public in the field, instead of delegating and entrusting this duty to one of Carpenter's propensities. This is contrary to standards published by the International Association of Chiefs of Police (IACP), Exh 52. This is no more than law enforcement circling the wagons when one of their own is under suspicion. A full investigation should at least include a written report by those witnessing or participating in the "critical incident. Expert Gilbertson supports this, creating at least a question of fact for the jury.

2. Use of force investigation was a sham & ratification of the deprivation

During the course of discovery we also learned that the formal document which decided the internal use of force review for this shooting declared that Deputy Shanks, the shooting officer, was acting to protect the wrong deputy: Deputy Koehnke, not Deputy Fry as Shanks himself claimed. Deputy Koehnke was in fact personally endangered by the shooting, as he was on the far side of the suspect's vehicle at the time of the shooting, and rounds pierced the outside of Mr. Heath's car in the general direction of Deputy Koehnke.

During discovery, we learned that the Use of Force review team was remarkably incurious about substantial issues with this shooting. They failed to inquire of the fact of cross fire, or of a "circular firing squad" effect of Shanks's actions. They failed to inquire of modifications of Shanks's firearm, which he said resulted in a "smoother trigger pull," implying a lesser trigger pressure to discharge the weapon. When asked, Richard Hecht, the County's FRCP 30(b)(6) designee, stated that the trigger pressure had never been tested, deferring to the range master to use his judgment. Exh 55, p. 16-18. There has never been an inspection after the shooting. They also failed to inquire of the fact that when Shanks first fired his weapon, his magazine fell from his pistol, disabling the weapon until he was able to reload and fire again, again likely resulting from another

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

modification of the weapon, an enlarged magazine eject button. They also failed to inquire of the potential alternative use of non-deadly force, such as a taser and chemical irritant spray with which Deputy Shanks was equipped. These devices were employable after the first round shattered the passenger window glass, which Mr. Heath survived, allowing unimpeded access to deploy these devices on Mr. Heath. They also failed to seriously consider Shanks's claim that he was protecting Deputy Fry when he expressly did not know where Deputy Fry was located, and Deputy Fry expressly says he was not endangered by the car. These multiple factors show that the Use of Force review was not a serious inquiry, and was a noticeably flawed investigation, as in *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991), which ratified the constitutional deprivation for *Monell* purposes, triggering liability of the municipality. Given the many flaws in the investigation cited above, a jury could well determine that the BOPS investigation was inadequate and a sham.

3. Policy of lack of report writing.

Failure to reprimand an employee may result in ratification of the action, but it takes more that mere failure to punish to create *Monell* Liability. In Larez, evidence was introduced that there were "holes" and "inconsistencies" in the review board's findings that should have been apparent to any reasonable administrator. *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1190 (D. Haw. 2003)VII. Deviation from the norms of police work, to excuse reports when there is potential liability of the officer, with little other purpose, should be sufficient to take the case to a jury. This deviates from the IAPC professional standards. Professor Gilberton is prepared to testify as follows, as stated in his report:

> The fact none of these Pierce County Deputies were required to write a use-of-force reports regarding the shooting of Brent Lee Heath simply defies logic, common sense, reason, and every investigative principle, strategy, and technique known to me as a police officer, private investigator, international police trainer, expert witness, and tenured college professor. In my opinion, the remarkable and inexplicable failure of the detectives assigned to investigate this incident to secure written statements from Shanks and the other deputies impeaches the integrity of their investigation and invalidates the findings of the Pierce County Sheriff's Office Board of Professional Standards.

VII.    STATE CLAIMS AUTHORITIES & ARGUMENT

1. Assault and Battery

**PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**
**(USDC WAWD No. 3:19-CV-06119-RJB) - 21**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

Qualified Immunity is not a defense to a claim of excessive force in effecting an arrest under State law theories. *Staats v. Brown*, 139 Wn.2d 757, 780; 991 P.2d 615 (2000). This is true in part because the State encourages civil suits instead of self help when an officer assaults a citizen. There are facts on which a jury should decide whether the force used was excessive, so the defense motion should be denied.

2. Negligence

Police may be liable under state negligence theories in the exercise of their duties. *Mancini v. City of Tacoma*, 196 Wn.2d 864, 479 P.3d 656 (2021), where police failed to use care in exercising a warrant on the wrong house. See also *Beltran-Serrano v. Tacoma*, 193 Wash.2d at 547, 442 P.3d 608, in which negligence was applied in a use of force case, so that the City could be liable for negligence that caused the plaintiff harm even where the subsequent harm was essentially a separate intentional tort by the same tortfeasor. *Id.* at 544-45, 442 P.3d 608. Here, under negligence principles, Shanks's decision to use force to "protect" Fry, not knowing where Fry was, when he was readily visible had he but looked, was negligence. There is a general duty to use ordinary care not to cause harm to the person injured. *Rose v. Nevitt*, 56 Wn.2d 882, 885, 355 P.2d 776, 777 (1960), *Lewis v. Scott*, 54 Wash.2d 851, 341 P.2d 488 (1959). At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others. *Beltran-Serrano, supra, at,* 550, citing Restatement (Second) of Torts § 281 cmt. e. This applies as well to law enforcement. *Beltra-Serrano, supra,* like here, involved a police shooting which could have been avoided by reasonable care. Certainly if the officers do act, they have a duty to act with reasonable care. *Coffel v. Clallam Cty.*, 47 Wn. App. 397, 403, 735 P.2d 686, 690 (1987).

VIII.   CONCLUSION

We request the court deny the defense motions in their entirety.

Respectfully Submitted this 14th day of June, 2021.

/s/   Anthony C. Otto
ANTHONY C. OTTO, WSBA 11146
Attorney for Plaintiffs
tony@anthonyotto.com

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on June 14, 2021 I electronically delivered a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment to the following:

3

4

Frank Cornelius: frank.cornelius@piercecountywa.gov
Peter Helmberger: peter.helmberger@piercecountywa.gov

5

DATED this 14th day of June, 2021, at Port Orchard, Washington.

6

7

            /S/  Karen Alfano
            KAREN ALFANO

8

            Paralegal to Anthony C. Otto
            P.O. Box 1368

9

            Port Orchard, WA 98366
            Ph: (360) 876-5566 / Fax: (360) 895-8689

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
(USDC WAWD No. 3:19-CV-06119-RJB) - 23**

Anthony C. Otto
Attorney at Law
Post Office Box 1368
Port Orchard, WA 98366
(360) 876-5566 Telephone
(360) 895-8689 Facsimile