UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ESTATE OF BRENT LEE HEATH, deceased, and MARIE JOYCE, as personal representative for the ESTATE OF BRENT LEE HEATH,<br><br>Plaintiffs,<br><br>v.<br><br>PIERCE COUNTY, a municipal corporation, and CARL SHANKS and JENNIFER SHANKS, and the marital community comprised thereof,<br><br>Defendants. | CASE NO. 3:19-cv-06119-RJB<br><br>ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt. 54. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

Plaintiffs' claims arise out of the shooting death of Brent Heath by Pierce County Sheriff's Deputy Carl Shanks. Plaintiffs allege that Deputy Shanks used excessive force and bring one claim against him pursuant to 42 U.S.C. § 1983, and claim assault, battery, and negligence. Plaintiffs also bring a § 1983 claim against Pierce County for its alleged policies.

ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

The primary issue in this motion is whether Deputy Shanks' use of force was reasonable as a matter of law. Defendants argue that it was, that he is entitled to qualified immunity even if it wasn't, and that all claims should be dismissed. For the following reasons, Defendants' motion should be granted, in part, and denied, in part.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

A. FACTS

1. The Pursuit

The following facts are not in dispute. Dkt. 61 at 3. On September 21, 2017, at approximately 10:06 p.m., Pierce County Sheriff's Deputy Mark Fry, traveling southbound, noticed a black Acura driving northbound with expired license tabs. Dkt. 54 at 2; Dkt. 62-51 at 2. Deputy Fry turned to catch up with the car, but it accelerated out of sight. *Id.* He followed suit. *Id.* Though Deputy Fry did not know at the time, Brent Heath was driving that car. *Id.*

About five minutes later, Deputy Shanks joined the pursuit, which reached speeds varying between approximately 50 to 90 mph and went through both side streets and a central business area. *Id.* at 3. Five to seven other police vehicles were involved in the pursuit. Dkt. 61.

Officers used tire spike strips several times to try to flatten the suspect's tires and slow the vehicle. Dkt. 55 at 8–9. Around 10:21 p.m., Deputy Fry noticed at least one of the tires had likely been hit because it started "throw pieces." Dkt. 54 at 3–4. At this point the pursuit went through a residential neighborhood, with speeds varying between 34 to 40 mph, and the suspect's vehicle again appeared to drive over the tire spikes and then began to slow. *Id.* at 9–11. Three of the four tires were flat, and the front right tire (passenger-side) had disintegrated and was running on the wheel rim. Dkt. 61 at 4.

2. The Shooting

Mr. Heath pulled his vehicle to the side of the road on Olney Avenue in Port Orchard, Washington. The vehicle was positioned at about a 70-degree angle, so the front two wheels and one rear tire were on dirt off the side of the road and at least one rear tire was on the cement. Dkt. 55 at 33; Dkt. 61 at 4.[1] Deputy Fry pulled his car up against the suspect's driver-side door at about a 30-degree angle, so the front of his car was against Mr. Heath's driver-side door and there was space between them in the rear. *Id.* Deputy Fry then ran around the back side of his vehicle to the rear passenger-side of the suspect's car. Dkt. 54 at 5. Deputy Shanks arrived and parked on the rear passenger-side of the suspect's car. *Id.*; Dkt. 62-2.[2] Deputy Shanks exited his vehicle, running along his passenger-side toward the front passenger-side of the suspect's car. Dkt. 54 at 6. He had his gun drawn – a Glock 35, .40 caliber semi-automatic pistol – his personal weapon that he says the Pierce County Sheriff's Department (the "Department") approved for use as a service weapon. Dkt. 61 at 10.

The following facts all appear to have happened within moments. Mr. Heath's vehicle attempted to move in reverse. Dkt. 61 at 5. Officers on the scene saw the front wheels begin to spin and the backup lights go on, but it did not initially start moving. *Id.* Deputy Shanks claims he could not see Deputy Fry and did not see that the tires were flat, but he knew Deputy Fry's car was on the rear side of the suspect's car and, fearing for Deputy Fry, fired the first shot through the passenger-side window. Dkt 54 at 8. He recalls experiencing tunnel vision. *Id.*

---

[1] The parties disagree about facts relating to the shooting, including offering different evidence about the precise positioning of the vehicles. *See* Dkts. 54 and 61. Plaintiffs claim the car was in this position based on statements by Deputy Fry. *Id.*

[2] There were six officers other than Deputy Shanks and Deputy Fry on the scene. These facts focus on the positioning of Deputies Shanks and Fry because Shanks only claims he shot out of fear for Deputy Fry. Dkt. 54 at 4, 5, and 8.

ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

According to Deputy Fry, he was still on the passenger-side of the suspect vehicle when Deputy Shanks fired that first shot. Dkts. 55 at 43. Fearing that the car would get moving and back onto the road, he ran around its rear toward his vehicle, intending to use it as a roadblock if needed. Dkt. 61 at 5. When asked whether at any point he felt his life was in danger, Fry Responded, "No, I did not feel any danger." Dkt. 62-51 at 11.

Deputy Shanks says that he saw the car lurch in reverse about one foot. Dkt. 54 at 8 and 61 at 8. According to Deputy Fry, it moved five to ten feet.[3] Dkt. 62-8 at 13–14. Deputy Shanks attempted a second shot, but he could not fire because his pistol's magazine had fallen to the ground. Dkt. 61 at 5. Moments later, he loaded a new magazine and fired four more times. Dkts. 54 at 9 and 61 at 5. Other officers on the scene describe this as being briefly after the first shot. *Id.* Right before or during the shooting, the suspect's car began moving forward. *Id.* It came to rest about twenty feet off the side of the road behind a guard rail. Dkt. 61 at 5; Dkt. 62-7 at 8.

One of the bullets hit Mr. Heath in the head. Dkt. 61 at 1. He survived for more than a year with severe injuries and died from complications related to the shooting on October 3, 2018. Dkt. 61 at 2.

2. Alleged Sheriff's Department Policies

Plaintiffs claim Pierce County is liable for Mr. Heath's injuries because of Department policies. Beginning in 2016, Department training on the use of force contained a slide, PowerPoint or something similar, labeled "*Plumbhoff*" [sic] after *Plumhoff v. Rickard*, 572 U.S.

---

[3] There are different estimates of rearward motion. Dkt. 61 at 8. The officers agree that there was some degree of rearward motion, then forward motion until the car came to a rest. *Id.*

ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4

765 (2014), a Supreme Court case discussing deadly force during a vehicle pursuit. The slide stated, "pursuit in itself enough to justify deadly force." Dkt. 62-1.

Emails between Department officials from two days before the shooting discussed "the current policy for shooting at moving vehicles." Dkt. 62-43 at 2. In email, Department administration officials ordered the *Plumhoff* slide be immediately removed because "the majority of deputies were misinterpreting the curriculum and made "concerning statements about what they learned." *Id.* When asked about department policy regarding the use of force, Deputy Shanks referred to his use of force training, which included the *Plumhoff* slide, and said, "my understanding of Supreme Court's rulings with regard to pursuits is that, I think they've had two rulings, is that using deadly force to stop a pursuit is not a violation of the Fourth Amendment." Dkt. 61 at 12.

Plaintiffs also bring claims based on the Department's internal review of the shooting. The Board of Professional Standards ("BOPS") reviewed the shooting and concluded: "The Board determined that the use of force was necessary and justified, Deputy Shanks feared for the life of Deputy Koneke [sic] and the other Deputies on the scene." Dkt. 61 at 13.

According to Plaintiffs, the BOPS conducted a "sham investigation" because it did not inquire into Deputy Shanks' use of his personal firearm, that he shot toward Deputy Koehnke, who was across from him, and it stated Deputy Shanks shot to protect Deputy Koehnke, not Deputy Fry. Dkt. 61 at 13–14.

Finally, Plaintiffs allege the Department had a policy that no officer involved in a "critical incident" and gives a recorded statement to an investigator needs to write a report about the incident. *Id.*

ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 5

B. PENDING MOTION

In the pending motion, Defendants move for summary judgment on all of Plaintiffs' claims. Dkt. 54. The order will first discuss the § 1983 claim against Deputy Shanks and qualified immunity, then the policy or practice claim against Pierce County, and finally the claims of assault, battery and negligence.

## II. DISCUSSION

A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Services. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elect.*

*Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. CLAIMS UNDER 42 U.S.C. § 1983 GENERALLY

To state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

A plaintiff must set forth the specific factual bases upon which he claims each defendant is liable. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Vague and conclusory allegations of official participation in a civil rights violation are not sufficient to support a claim under § 1983. *Ivey v. Board of Regents*, 673 F.2d 266 (9th Cir. 1982). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).

## C. QUALIFIED IMMUNITY

Defendants in a § 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person, in this case a reasonable police officer, would have known. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow*, 457 U.S. at 815. The existence of qualified immunity turns on the objective reasonableness of the actions, without regard to specific knowledge or subjective intent. *Id*. at 819.

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether, if so, the conduct violated clearly established law when viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. These are questions of law to be determined by the court. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Questions of fact may exist and preclude summary judgment, for example whether there was reasonable suspicion or probable cause to justify use of force. *Id*.

The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Saucier*, 121 S.Ct. at 2156.

### 1. Fourth Amendment Analysis

Whether an officer used excessive force under the Fourth Amendment involves an objective inquiry into whether an officer's actions were reasonable considering the particular circumstances. *Graham v. Connor*, 490 U.S. 386, 394 (1989). This analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. It is "highly fact-specific" inquiry. *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Scott*, 550 U.S. at 383).

Here, the nature and intrusion on Mr. Heath's Fourth Amendment rights was the use of deadly force. The use of deadly force is reasonable when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. Therefore, the key question is whether Deputy Shanks "had an objectively reasonably basis for believing [the suspect] posed a threat of serious physical harm, either to [] himself or to others." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

Deputy Shanks claims that he feared Mr. Heath would hit Deputy Fry with his car. "A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it." *Villanueva*, 986 F.3d at 1170 (quoting *Orn*, 949 F.3d at 1174).

Courts have historically found that deadly force is justified to stop a high-speed vehicle chase. *See e.g.*, *Mullenix*, 577 U.S. at 15 ("The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment."); *Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment."). However,

that conclusion is dependent on the chase posing a genuine risk of serious injury based on circumstances like speed and location. *See id.*

Defendants analogize *Wilkinson v. Torres*, 610 F.3d 546, a case in which an officer shot into a stopped minivan that was attempting to accelerate. Dkt. 54 at 21–22. In *Wilkinson*, police pursued a stolen minivan. *Id.* at 549. The minivan swerved to avoid a police car and hit a telephone pole after a long and eventful pursuit. *Id.* One officer, Officer Key, moved by foot toward the van but fell to the ground about the same time it started moving in reverse. *Id.* He managed to get out of the way to avoid being run over. *Id.* Another officer, Officer Torres, saw Key fall to the ground and that the van continued to move. Torres thought Key had been struck and could be run over and shot through the passenger-side window. All of this happened in about nine seconds immediately following the high-speed pursuit. *Id.* at 554. The Ninth Circuit found that, under those circumstances, Torres did not use excessive force because he had "probable cause to believe the suspect posed an immediate threat to the safety of Key and himself." *Id.* at 551.

Unlike in *Wilkinson*, there is no obvious justification for why Deputy Shanks assumed Deputy Fry was in danger. Shanks' view was not clearly obstructed; Deputy Fry was standing upright a few feet to his left, arguably within his line of sight. Dkt. 61 at 7. The suspect car had intentionally come to a stop and was surrounded by police vehicles, which makes the situation more contained then in *Wilkinson*. No other officer on the scene felt they were in imminent danger, not even Deputy Fry. *Id.* at 5. Furthermore, Deputy Shanks claims he fired the first shot when the vehicle attempted to move in reverse because he feared Deputy Fry was in its path, but he fired the following four shots while the vehicle moved forward. Dkt. 54 at 8–9. There are genuine issues of material fact, but a reasonable jury could find that Deputy Shanks' use of force

was unreasonable. Therefore, the Court must consider whether the alleged conduct violated clearly established law.

### 2. Clearly Established Analysis

An officer violates clearly established law if "every reasonable officer would have understood" that his or her actions violated the law. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

The use of deadly force in this case notably did not occur during a high-speed chase. *See e.g.*, *Mullenix*, 577 U.S. 7, 15; *Scott*, 550 U.S. 372. Instead, the vehicle was at a stop and substantially disabled, though it showed signs of attempting to accelerate. It eventually moved a maximum of about 20-feet. Two of the most analogous cases are *Villanueva v. California*, 989 F.3d 1158 (9th Cir. 2021), and *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020). Though both were decided after the shooting at issue here, both found that an officer violated clearly established law, relying on *Acosta v. City and Cnty. of San Francisco*, 83 F.3d 1158 (9th Cir. 1996).

"*Acosta* [] clearly established that an officer who shoots at a slow-moving car when he can easily step out of the way violates the Fourth Amendment, as we recently reaffirmed in *Orn*." *Villanueva*, 986 F.3d at 1171.

In *Villanueva*, a vehicle was stopped in an intersection where the street ran at essentially a 90-degree angle. *Id.* at 1163. The vehicle went into reverse to attempt a three-point turn, during which time officers opened fire and killed the driver, Villanueva, and injured the passenger. *Id*. The officers argued their use of deadly force did not violate the Fourth Amendment as a matter of law because Villanueva posed an immediate threat of serious harm or

injury to a specific officer standing near the vehicle. *Id.* at 1169. The Ninth Circuit disagreed and emphasized that "witness testimony suggests that Villanueva's three-point turn was controlled, that he did not crash into another car, and that he never accelerated toward the police vehicle or the Officers." *Id.* at 1170.

In *Orn*, the driver of an SUV attempted to navigate around police vehicles blocking his path through a parking lot. 949 F.3d at 1173. To do so, he was moving about 5 mph when a police officer shot him, with one bullet hitting him in the spine. *Id.* In analyzing the clearly established prong of qualified immunity, the court emphasized that an officer "is not entitled to qualified immunity based on his claimed fear for the safety of others . . . The objective reasonableness of [] fear for [] safety is again dependent on the jury's acceptance of his account of the shooting." *Id.* at 1179. It concluded, "[i]n the end, this is not a case in which the legality of the officer's conduct falls within the 'hazy border between excessive and acceptable force.'" *Id.* at 1181 (*quoting Saucier*, 533 U.S. at 206).

When considered in the light most favorable to Plaintiffs, this also is not a case in which the legality of conduct falls within a hazy border. As established in *Acosta*, a reasonable officer should have had a "fair and clear warning" that deadly force is not justified when a vehicle doesn't pose an immediate threat because it is moving slowing and either no one is in its path or anyone in its path could easily step out of the way. Like in *Villanueva* and *Orn*, a reasonably jury could conclude that Mr. Heath was not going anywhere fast and that no officer was in immediate danger.

Accordingly, Defendants' motion for summary judgment on the issue of qualified immunity should be denied.

### D. *Monell* Claim against Pierce County

Plaintiffs also bring an excessive force claim against Defendant Pierce County under the doctrine of municipal liability established in *Monell*, 436 U.S. 658.

To support this claim, Plaintiffs must show that: (1) they were deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to their constitutional rights; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001) (*internal quotations omitted*).

> There are three ways to show a policy or custom of a municipality: (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotation marks and citations omitted).

Plaintiffs allege *Monell* liability applies for three reasons. First, because the Department had a policy that "pursuit in itself is enough to justify deadly force." Dkt. 61 at 11. Second, because the Department's Board of Professional Standards ("BOPS") ratified Deputy Shanks' use of force. *Id.* at 13. Third, because the Department did not require officers to write incident reports. *Id.* at 14 – 15.

1. "*Plumhoff* Slide" and Use of Force Training

There is a genuine issue of material fact as to whether the Department's use of force training was the "moving force" behind Mr. Heath's injury. Department officials knew that the

training, training that Deputy Shanks received, was misleading officers about when deadly force could be used against a moving vehicle. Dkts. 62-43 at 2, 61 at 11, and 62-43 at 2.

A reasonable jury could conclude that the training left a foreseeably unreasonable impression about when deadly force is reasonable and that without that training Deputy Shanks would not have shot Mr. Heath.

2. <u>Ratification</u>

Plaintiffs argue that Pierce County ratified Defendant Shanks use of force because BOPS conducted "a sham investigation." Dkt. 61 at 14. Even if BOPS did conduct a sham investigation, it would be insufficient support a claim of *Monell* liability under a theory of ratification.

Plaintiffs do not identify the policy maker who allegedly considered and then ratified Deputy Shanks' use of force and the basis for it. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) ("[P]laintiff must prove that authorized policy makers approve a subordinate's decision and the basis for it."). Plaintiffs imply the BOPS is a final policymaker but do not support this claim with evidence. *See* Dkt. 61 at 20–21.

Therefore, Plaintiffs' ratification claim fails.

3. <u>Policy of Lack of Report Writing</u>

Assuming the Department did have an official policy that officers involved in critical incidents and provided a recorded statement to an investigator did not need to write a report, there is no genuine issue of material fact about whether that policy was the moving force behind Mr. Heath's injury.

Plaintiffs' argument derives *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), which considered whether evidence of repeated failures to investigate claims of excessive force

ORDER DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

could support a judgment against the Los Angeles Police Department under *Monell*. The court found that there was sufficient evidence to support a judgment because the police chief knew or reasonably should have known that repeated failure to investigate would cause others to inflict constitutional injury. *See id.* at 647 (evidence of custom of using excessive force, and failure to remediate essentially acquiescence to its use).

Plaintiffs here do not present evidence that allowing recorded statements instead of written reports foreseeably caused officers to unreasonably use deadly force. Even if that policy fell below professional standards, there is no evidence that it fostered a culture of excessive force that was the moving force behind Mr. Heath's death.

Therefore, Plaintiffs' claim based on a policy of not requiring written reports fails.

**E. Assault and Battery**

As discussed in the earlier section on qualified immunity, *supra* Section II-C, there is a genuine issue of material fact as to whether Deputy Shanks' use of force was reasonable. Therefore, Defendants' motion for summary judgement on Plaintiffs' assault and battery claims should be denied. *See McKinney v. City of Tukwila*, 103 Wn. App. 391, 641 (2000); *Staats v. Brown*, 139 Wn.2d 757, 780 (2000).

**F. Negligence**

To prevail on a negligence claim, a plaintiff must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as a proximate cause of the injury." *Mancini v. City of Tacoma*, 196 Wn.2d 864, 879 (2021) (internal citations omitted). Police officers "owe a duty of reasonable care in the exercise of their official duties." *Id.* (citing *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550 (2019)). "This duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing

harm to another through affirmative acts of misfeasance." *Id.*

Deputy Shanks, as a law enforcement office owed a duty specific duty to Mr. Heath, as a person with whom he had a specific and direct interaction. *See Beltran-Serrano*, 193 Wn.2d at 551. There are genuine issues of material facts as to breach of that duty and causation. Therefore, summary judgment on this issue is inappropriate.

**G. Amended Expert Report**

Defendants argue that an amended report submitted by Plaintiffs' expert Gregory Gilbertson was untimely and should be stricken. Dkt. 71. The Court did not rely on that report for this motion. The Court will not strike the report at this time, but Defendants may raise this argument again, should it be necessary.

## III. ORDER

Therefore, it is hereby **ORDERED** that:

Motion for Summary Judgment (Dkt. 54) **is granted, in part, and denied, in part**. It is granted only as to Plaintiffs' claims against Pierce County under 42 U.S.C. § 1983 for ratification and an alleged policy of not requiring written report writing, and it otherwise is denied.

**IT IS SO ORDERED.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 30th day of June, 2021.

ROBERT J. BRYAN
United States District Judge